WIENER, Circuit Judge,
Specially Concurring in Circuit Judge REAVLEY’s dissent, joined by REAVLEY, Circuit Judge:
As I wholeheartedly concur in Judge Reavley’s dissent, I write separately only *291 to add a perspective that I find helpful in analyzing this case and demonstrating that Judge Reavley has gotten it right. I refer in general to the key differences between arbitration under the FAA and litigation in federal court; I refer in particular to one difference that is of prime significance in this case, viz., the disparate ways that the decision maker — an Article III judge on the one hand and an arbitrator on the other — is selected, and the unique role of the potential arbitrator’s unredacted disclosure of his relationships with the parties and their counsel to ensure selection of an impartial arbitrator. These general and particular differences underscore why such full and fair disclosure by a potential arbitrator of every conceivable relationship with a party or counsel, however slight, is a prerequisite. No relationship with a party or a lawyer is too minimal to warrant its disclosure, even if, in the end, it might be deemed to be too minimal to warrant disqualification. Such an evaluation by the potential arbitrator, and any withholding of information based on it, are simply not calls that he is authorized to make, yet ones that Lawyer Shurn obviously made.
The penumbral point that supervenes this case lies in our recognition of the legal distinction between disclosu/re and disqualification in the context of arbitration. Justice White, in his celebrated and thoroughly vetted concurrence in Commonwealth Coatings Corp., “remarked” that the Supreme Court was not deciding that “arbitrators are to be held to the standards of judicial decorum of Article III judges” or that arbitrators are “automatically disqualified by a business relationship” with the parties to arbitration or them counsel.[1] What must be emphasized is that Justice White did not “remark” that the differences between the standards of decorum applicable to judges and those to which arbitrators are held has anything at all to do with the immutable prerequisite that, before the parties sign off on a candidate for arbitrator, they must have received from him an unexpurgated disclosure of absolutely every past or present relationship with the parties and their lawyers.[2] That the potential arbitrator himself might deem one or more of such relationships to be so de minimis as not to require its divulgence is irrelevant; such culling of information by a candidate must never be allowed to seep interstitially into the disclosure calculus. Justice White’s remark that disqualification is not automatic for minor business relationships is simply inapposite to the requirement of full disclosure of every relationship, large and small. This is because, in arbitration, disqualification (more accurately, rejection) is the exclusive province of the parties, each of whom is entitled to make its determination on the basis of total disclosure of relationships, not on the basis of some truncated version that has been cherry-picked by the nominee for the position of arbitrator.
Most who have commented on Justice White’s statement have failed to analyze its full import in depth, treating it either as a tautological musing or as a starting point for holding arbitrators to a lesser degree of impartiality and “recusability” than trial judges. I am convinced, though, that Justice White meant much more, at least regarding the absolute nature of the duty of a potential arbitrator to disclose every relationship large and small. This is because he and the other justices who joined the Black opinion knew full well *292 who it is that has the sole authority and duty to determine whether a candidate for the post of arbitrator should be accepted or rejected: the parties and they alone.
The tradeoffs attendant on the dispute-resolution choice between litigation and arbitration are well and widely known: The principal benefits usually ascribed to arbitration are speed, informality, cost-savings, confidentiality, and services of a decision-maker with expertise and familiarity with the subject matter of the dispute. These “pluses,” however, are not without offsetting “minuses.” The informalities attendant on proceedings in arbitration come at the cost of the protections automatically afforded to parties in court, which reside in such venerable institutions as the rules of evidence and civil procedure. Likewise sacrificed at the altar of quick and economical finality is virtually the entire system of appellate review, as largely embodied for the federal courts in rules of appellate procedure and the constantly growing body of trial, appellate, and Supreme Court precedent interpreting and applying such rules. By dispensing with such basic standards of review as clearly erroneous, de novo, and abuse of discretion, there remain to parties in arbitration only the narrowest of appellate recourse.
A less frequently encountered and less frequently discussed distinction and its tradeoffs is the one implicated here: the vital difference between the method by which a federal judge is selected to hear a case in litigation vis-a-vis the méthod by which arbitrators are selected — a distinction hinted at by Justice White but frequently overlooked or misinterpreted. All know that trial judges in the federal system are nominated and confirmed only after a rigorous testing of their capabilities, experience, and integrity. In contrast, arbitrators are quickly selected by the parties alone, who frequently have unequal knowledge of or familiarity with the full history of potential arbitrators. Federal trial judges are full-time dispute resolvers; the experience of arbitrators falls all along the experience spectrum, from those who might serve but once or twice in a lifetime to those who conduct arbitration with increasing regularity. The trial judge who is to hear a case is almost never “selected” by or agreed on by the parties; rather, such judge is “selected” or designated by objectively random or blind assignment through long established court procedures (except in the rare case of a party’s successful forum shopping in a single-judge district, or consenting to try a case to a known magistrate judge). In stark contrast, it is the parties to arbitration themselves who have sole responsibility for the selection of their arbitrator or arbitrators.
It follows then that because they alone do the selecting, the'parties to arbitration must be able to depend almost entirely on the potential arbitrator’s good faith, sensitivity, understanding, and compliance with the rules of disclosure by candidates for the post. And, even then, appellate relief is an avis rara when it comes to questions of bias, prejudice, or non-disclosure in arbitration. Consequently, except for such background checks that the parties might be able to conduct, the only shield available to the parties against favoritism, prejudice, and bias is full and frank disclosure, “up front,” by each potential arbitrator. And even that is far less efficacious than the safeguards that are afforded to parties in litigation through the elaborate rules of professional conduct, disqualification, and recusal, and the body of law and procedure thereon developed in the crucible of the very formal and extensive judicial system.
The point that I belabor here is that, because parties to arbitration have virtually none of the protections against preju *293 dice and bias (or the appearances thereof) that are automatically and routinely afforded to litigants in federal court, the single arrow remaining in the otherwise-empty quiver of protection afforded to parties in arbitration — full, unredacted disclosure of every prior relationship — must be rigorously adhered to and strenuously enforced. Indeed, it is these very differences in the disclosure standards — not disqualification standards — to which judges are held vis-á-vis those to which arbitrators are held that demand unyielding fealty to both the letter and spirit of the disclosure requirement: With such a slim safeguard against bias or the appearance of bias in arbitration, the reason is obvious why such mandated disclosure of every relationship, without self-abridgment by the potential arbitrator, must be assiduously enforced.
In federal court, it is the system and the judges who perform the “gatekeeper” function to exclude decision-maker favoritism or its appearance. In arbitration, though, it is the parties who are the gatekeepers, and not the potential arbitrators or the arbitration associations (or their rules). Filtration of partiality in arbitration is the exclusive prerogative and duty of the parties — and only the parties — as it is they alone who select the decision maker. As gatekeepers, the parties are charged with guarding against favoritism and prejudice, a duty that they cannot possibly discharge in the absence of total disclosure.
In exchange for the actual or perceived economies of time, money, expertise and confidentiality, the parties to arbitration alone are responsible for who it is that will decide their fates. Subject to only relatively insignificant limitations, the parties (or in the case of panels, each party’s selected arbitrator) have virtually absolute control over accepting or rejecting a nominee for the role of decision maker. It cannot therefore be left to the fox, who is the potential arbitrator, to guard the arbitration henhouse, secretly identifying to himself alone all “prior or present relationships,” then just as secretly deciding which are worthy of disclosure and which are not. On the contrary, avoidance of partiality in the selection of the arbitrator can be achieved only if, in discharging his duty of disclosure, the potential arbitrator objectively disgorges absolutely every conceivable fact of prior or present relationships with parties or counsel, regardless of how tenuous or remote they might seem to him. He must leave to the parties the value judgment as to which (if any) among those fully disclosed facts constitutes a basis for rejecting the potential arbitrator for bias or the appearance of bias. Only of and after that is done can disclosure translate into disqualification or rejection.
Thus the system fails when the nominee for the post of arbitrator takes it upon himself to make the value judgment whether a relationship is so inconsequential that it need not be disclosed at all. Arbitration’s scant protection against bias and favoritism obviously breaks down completely when the question whether a relationship should be disclosed is assumed sub silentio by the potential arbitrator rather than by disclosing all and allowing the parties to make that call following their receipt of all facts through an unabridged disclosure.
Who knows? If Shurn had dutifully reported his prior professional relationships and interaction with counsel for New Century, counsel for Positive Software might nevertheless have accepted Shurn. But Shurn’s very act of preemptively deciding, solely on his own, that his prior relationship with counsel for New Century need not be disclosed and then withholding that information, conveys an unmistakable appearance of impropriety. To me, that mis *294 step is more than sufficient to support the objections of Positive Software that it was deprived of its right to be informed of the prior relationship between Shurn and the Susman, Godfrey firm, and to make its own evaluation of the significance of that connection.
I end where I began: The vast gulf between resolving disputes in federal court and resolving them in arbitration — especially the often overlooked distinction between disclosure and disqualification and between who plays the gatekeeper role of selecting the decision maker — frames the issue we decide today. In arbitration, full disclosure is the proverbial slender reed against which we lean prevention of favoritism to prop up the highly circumscribed ability of a party to ferret out a candidate’s prior relationships and then determine whether, as to that party, the relationship does or does not impinge on impartiality. This anorexic reed must not be further slenderized, as the majority does today. For the system to enjoy credibility, each potential arbitrator absolutely must disclose every relationship with the parties and counsel, no matter how minimal or insignificant the aspiring arbitrator might deem it to be. For it is not the prerogative of the candidate to pick and choose, but the prerogative of the parties alone to decide such significance. And that cannot be done with any degree of comfort absent full disclosure. These reasons and those expressed by Judge Reavley compel me to concur in his dissent.

. Emphasis mine.

. As noted by Justice White, "relationship” here does not include mere chance encounters or personal introductions.